**OUTTEN & GOLDEN LLP**
Cara E. Greene
Gregory S. Chiarello
3 Park Avenue, 29th Floor
New York, New York 10016
(212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAUREN O'NEILL,<br><br>                     Plaintiff,<br>      v.<br><br>DATAMINR, INC.<br><br>                Defendant. | **No. 15 Civ. 9485**<br><br>**COMPLAINT**<br><br><u>**Demand for Trial by Jury**</u> |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff Lauren O'Neill ("Ms. O'Neill") brings this action against Defendant Dataminr Inc. ("Dataminr" or "the Company") for violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000C, et. seq., the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12111–12117, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*.

2.      Dataminr hired Ms. O'Neill in August 2012 to work in the Company's New York office as the first employee dedicated to clients or prospective clients in the public sector. Ms. O'Neill, who was the only senior woman in the Company at the time of her hire, was a dedicated employee with a positive performance record.

3.      In February 2014, Dataminr hired Kris Teutsch as Vice President for the Public

Sector. Over the next months, Mr. Teutsch subjected Ms. O'Neill to unlawful gender and

disability discrimination. After Ms. O'Neill complained about the discrimination, Dataminr

subjected Ms. O'Neill to escalating acts of retaliation, ultimately terminating Ms. O'Neill's

employment on August 25, 2014.

## JURISDICTION AND VENUE

4.      This case arises, in part, under federal statutes including Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000C, et. seq. ("Title VII"), and the Americans

with Disabilities Act, as amended, 42 U.S.C. §§ 12111–12117 ("ADA"). Ms. O'Neill filed a

charge of discrimination and retaliation with the Equal Employment Opportunity Commission

("EEOC") on September 11, 2014. On or around June 15, 2015, the EEOC issued Ms. O'Neill a

Notice of Right to Sue. Therefore, this court has original jurisdiction of this matter pursuant to 28

U.S.C. § 1331.

5.      The claims Ms. O'Neill brings under the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-101 *et seq.* ("NYC HRL"), arise out of the same incident as the federal

claims that are properly before this Court. Therefore, the court properly exercises pendent

jurisdiction over the NYC HRL claims.

6.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions in this action occurred within the Southern District of

New York.

## PARTIES

**Lauren O'Neill**

7.     Plaintiff, Lauren O'Neill, is a 36-year-old woman. At the age of 18 she was diagnosed with Major Depressive Disorder and has been under a doctor's care since that time.

8.     Ms. O'Neill graduated from Vanderbilt University with high honors, before earning a master's degree from the Georgetown University's School of Foreign Service in the Securities Studies Program. She then joined the Institute for Defense Analyses ("IDA"), a federally funded research and development center that works for the U.S. Department of Defense ("DoD") as part of the Joint Advance Warfighting Division. From 2005 to 2006, she conducted research at the Risoe National Laboratories in Denmark on a Fulbright Fellowship. After two more years at IDA, she started working on the first big data program in the US government for the Defense Advanced Research Projects Agency ("DARPA") in both Washington, D.C. and Kabul, Afghanistan, where she performed strategic data analysis for the DoD and headed a defense data research initiative to identify insurgent safe havens in Afghanistan.

9.     During all relevant times, Ms. O'Neill was qualified for her positions with Dataminr and was able to perform the essential functions of her positions, with or without a reasonable accommodation.

10.     Ms. O'Neill currently resides in New York, New York.

**Dataminr, Inc.**

11.     Defendant Dataminr, Inc. is a Delaware corporation doing business within New York County in the State of New York. The Company maintains corporate headquarters within the City and County of New York at 6 East 32nd Street, New York, New York, 10016.

12.     Dataminr holds itself out to be a technology company that provides algorithmically-detected breaking news from Twitter to private and public entities. Dataminr's public sector applications relate to law enforcement, national security, and public safety.

13.     During all relevant times, Dataminr was Ms. O'Neill's employer within the meaning of all applicable statutes.

14.     Upon information and belief, at all times pertinent hereto, Dataminr employed more than 15 people at its Manhattan office.

## FACTUAL ALLEGATIONS

15.     Dataminr hired Ms. O'Neill on August 6, 2012, as an analyst and as Dataminr's first employee dedicated to clients or prospective clients in the public sector. After only a few weeks, Dataminr changed Ms. O'Neill's title to Director of Programs for the Government. In that role, Ms. O'Neill performed both client-facing and technology-related work. She developed business leads, engaged clients, facilitated client relationships and programs, and worked with the product team to improve the data set. As a manager, she was involved in hiring numerous new employees.

16.     Dataminr is a male-dominated environment. When Dataminr hired Ms. O'Neill in August 2012, it had 23 employees, yet Ms. O'Neill was the only woman in a non-HR or secretarial role. Since August 2012, Dataminr has grown to approximately 250 employees, but men continue to constitute the large majority of employees, including those in management positions.

17.     Ms. O'Neill performed well as Director of Programs and received positive feedback from clients and colleagues. In February 2013, she earned a positive oral review of her

2012 performance from Dataminr's CEO, Ted Bailey, and the Chief Strategy Officer ("CSO"), Peter Bailey.

18.     In or about early 2014, Peter Bailey gave Ms. O'Neill a positive written review of her 2013 performance. The early 2014 review did not identify any areas for improvement. As recognition for her positive performance, she was one of only a handful of employees to receive a raise for 2014.

**<u>Dataminr Discriminates Against Ms. O'Neill</u>**

19.     In March 2014, Dataminr hired Kris Teutsch ("Teutsch"), as Vice President for the Public Sector. Mr. Teutsch became Ms. O'Neill's direct supervisor.

20.     With Mr. Teutsch's arrival, Ms. O'Neill's role changed to Director of State and Local Sales for the Public Sector. The new position included responsibility for developing a client base in state and local markets in New York, Boston, Chicago, Philadelphia, and Washington D.C. Previously, Dataminr had marketed itself primarily to federal agencies.

21.     Ms. O'Neill was very successful in the new role as Director of State and Local Sales. In her first three months in the position, she engaged approximately 100 users in Illinois, New York, and Boston to use Dataminr on a trial basis, and Mr. Teutsch remarked that through Ms. O'Neill's work, Dataminr had by then signed on more state and local users than federal users.

22.     Despite Ms. O'Neill's excellent credentials and work product, Mr. Teutsch questioned her decisions, was hostile to her views, and undercut her authority in front of colleagues and clients – behavior he did not exhibit towards her male colleagues. Mr. Teutsch would agree with Ms. O'Neill in private conversations, only to disparage her publicly on the same issue later on.

23.     For example, when Ms. O'Neill discussed a potential client – Rio de Janeiro, Brazil, the site of the 2016 Olympics – with Mr. Teutsch privately, he was impressed and enthusiastic with her progress in the market and encouraged her to pursue the account. However, during a May 20, 2014 weekly public sector team call in which Ms. O'Neill was the only woman present, Mr. Teutsch was hostile and dismissive of the prospect and her efforts to approach this potential client – critiques he had not raised in their private discussions.

24.     Mr. Teutsch excluded Ms. O'Neill from the hiring process of new team members, although he included men in the process. Prior to Mr. Teutsch joining Dataminr, Ms. O'Neill had taken a lead role in recruiting and hiring of all members of the public sector team.

25.     Concerned with the way Mr. Teutsch was treating her, in or about April 2014, Ms. O'Neill approached him and asked if something was wrong. He responded that he had heard from other Dataminr employees that she could be "emotional" and "intense," but admitted that he had not seen behavior consistent with that opinion.

26.     Ms. O'Neill's workplace demeanor was appropriate and she had not been criticized for this prior to Mr. Teutsch joining the Company.

27.     Later in April 2014, Ms. O'Neill had a sales meeting and demonstration at Boston City Hall with a potential local public sector client. In a phone call prior to the meeting in Boston, Mr. Teutsch questioned Ms. O'Neill's ability to handle the meeting and demeaned her, saying "when you fail, be sure to bring in someone else so you don't bring the whole team down."  Ms. O'Neill was visibly upset by Mr. Teutsch's demeaning behavior. Later that day, Mr. Teutsch called to apologize for his behavior.

28.     A short while later, Mr. Teutsch warned Ms. O'Neill not to be "emotional" in the office – an apparent reference to her response to his demeaning behavior during the phone call prior to the Boston meeting.

29.     In or about mid-June 2014, Sakima Johnson (neé Kelly), Dataminr's HR Director, asked Ms. O'Neill to complete an Equal Employment Opportunity form. The form requested disclosure of personal information, including whether Ms. O'Neill had a disability and the nature of the disability. Ms. O'Neill checked the box indicating that she had a disability.

30.     On or about June 30, 2014, Ms. O'Neill met with Mr. Teutsch and Ms. Johnson to discuss her mid-year performance evaluation. On information and belief, Mr. Teutsch did not ask Ms. Johnson to participate in performance evaluation meetings with his male subordinates and Ms. Johnson did not participate in performance evaluation meetings with his male subordinates.

31.     Mr. Teutsch informed Ms. O'Neill that her mid-year performance rating would be 3 out of 5, or "Meets Expectations." While a "Meets Expectation" is considered a satisfactory performance evaluation, Ms. O'Neill's objective performance was deserving of a better performance score. When Ms. O'Neill asked Mr. Teutsch for specific examples of problems with her performance, he responded that the issue was not the "what" but the "how," and refused to elaborate on what he meant. Mr. Teutsch did reference his April 2014 directive that she not be "emotional" in the office, but stated that she had performed well with respect to that request. Her written performance evaluation also noted that she had improved in this area.

32.     Ms. O'Neill was concerned about the discriminatory way Mr. Teutsch was treating her and the involvement of HR in her performance evaluation meeting and decided to record the June 30 meeting. After Mr. Teutsch and Ms. Johnson learned that she was attempting to record the meeting, they abruptly adjourned the meeting until the next day.

33.     During the meeting on or about July 1, 2014, Ms. O'Neill complained to Ms. Johnson about the way Mr. Teutsch was treating her. Ms. Johnson responded that Ms. O'Neill was just "trying to find reasons not to like Kris [Teutsch]."

34.     On or about July 2, 2014, Ms. O'Neill met with Mr. Teutsch, Tania Secor, Dataminr's CFO, and Ms. Johnson. During that meeting, Mr. Teutsch placed Ms. O'Neill on a performance improvement plan ("PIP"). The PIP criticized her "emotional outbursts" with other employees on three occasions, one of which allegedly included Ms. Johnson. These criticisms were not raised during the mid-year evaluation, although they had occurred prior to the mid-year performance review, and the incidents referenced were taken out of context; Ms. O'Neill was not given the opportunity to address the circumstances for which Dataminr was criticizing her.

35.     The PIP's "Performance Objectives" included a series of new and unattainable business goals for Ms. O'Neill that were unrelated to the perceived criticisms. The revised business goals, which did no relate to the criticisms in the PIP, included significant requirements for four major markets, plus all of Ohio and Michigan; areas Dataminr and Ms. O'Neill had not previously targeted.

**Ms. O'Neill Complains of Discrimination**

36.     On or about July 7, 2014, Ms. O'Neill sent an email to Mr. Teutsch, Ms. Johnson, and Ms. Secor (the "July 7 Email") concerning her sudden and unwarranted placement on a PIP. She observed that just two weeks prior to the PIP she had disclosed to HR that she had a disability. In the email she explained that for the past 20 years she had been treated for Major Depression, but noted that her disability did not impede her ability to perform her job.

37.     In the July 7 email, Ms. O'Neill also stated that she believed her gender and disability had influenced Dataminr's poor treatment of her. She noted that Dataminr's criticisms

of her targeted her disability and gender, evidenced in part by Dataminr's repeated comments that it found her to be too "emotional" or "aggressive." She noted that these criticisms echo stereotypes around gender and depression and were not performance issues at all. She also noted that Dataminr's new business expectations were unreasonable and had never been raised with her in the past and she felt as if Dataminr was setting her up to fail.

38.      On July 8, 2014, Ms. Johnson and Ms. Secor, who worked closely with Mr. Teutsch, arranged a meeting with Ms. O'Neill to discuss what they termed her "claims."  At the meeting, Ms. Johnson and Ms. Secor told her that the PIP would remain in place, but that they would conduct an investigation into the issues Ms. O'Neill had raised. A few days later, HR notified Ms. O'Neill of the results of the "investigation": a brief memorandum stating that Ms. Secor and Ms. Johnson did not believe that she had been treated differently from other employees because of her gender or disability. The memorandum did not explain how the investigation had been conducted and neither Ms. Johnson nor Ms. Secor would give Ms. O'Neill any information regarding the investigation.

39.      Dataminr's discrimination and retaliation exacerbated Ms. O'Neill's disability, worsening her condition. On July 14, 2014, she requested permission to work from home as a temporary accommodation of her disability. Dataminr granted her request to work for home for a period of seven days, which it later extended to six weeks after Ms. O'Neill provided a doctor's note. Her scheduled return date to the office was September 8, 2014.

**Dataminr Retaliates Against Ms. O'Neill Because of Her Protected Conduct**

40.      After Ms. O'Neill complained of discrimination and requested an accommodation of her disability, Dataminr engaged in escalating retaliation against her.

9

41.     Mr. Teutsch began to exclude Ms. O'Neill from internal and client meetings that she ordinarily would have attended, even though it was standard for members who were away from the office to participate via conference call.

42.     Mr. Teutsch also continued to exclude her from the hiring process for new team members, although he included men from her group in the hiring of new team members.

43.     Additionally, Mr. Teutsch began to copy Ms. Johnson, the head of HR, on every email he sent to Ms. O'Neill. Mr. Teutsch had not done so before, and on information and belief, he did not do so for other employees. Mr. Teutsch also began including Ms. Johnson or Ms. Secor in his weekly business meetings with Ms. O'Neill. To Ms. O'Neill's knowledge, hers were the only business meetings in which HR participated.

44.     Further, following Ms. O'Neill's complaints of discrimination and request for an accommodation, Dataminr raised new "Areas of Concern" that were unfounded and had never been raised with her before – either in the original PIP or mid-year performance evaluation. Dataminr also continued to add unrelated business goals and additional responsibilities as "Performance Goals." When Ms. O'Neill asked Mr. Teutch which aspects of the business goals she should prioritize, he responded, "Everything."

45.     In July, during one of the weekly business meetings with Mr. Teutsch, Ms. Johnson raised the number of Ms. O'Neill's absences earlier in 2014 (before her mid-year evaluation), and suggested that Ms. O'Neill should take a medical leave of absence. The number of sick days Ms. O'Neill took was within the bounds of the Company's sick leave policy, and she informed Ms. Johnson that she had no need for a leave. The Company's practice had always been to allow for as many sick days as an employee needed.

46.     Throughout July and August, Mr. Teutsch continued to demean and undermine Ms. O'Neill in front of her male team members. For instance, on or about August 19, 2014, during a client crisis in Illinois (the "Illinois Crisis"), Mr. Teutsch told Ms. O'Neill during a team conference call not to get "frantic" and to "stay composed" when she flew out to assist the client, and asked Ms. O'Neill whether she could "handle it."  Mr. Teutsch did not publicly question her male colleagues' abilities or their ability to perform their job.

47.     Ms. O'Neill traveled to Illinois on August 21, 2014, as part of the Illinois Crisis response. Prior to Ms. O'Neill leaving for Illinois, Mr. Teutsch instructed Ms. O'Neill on how many employees she should dedicate to the assignment. Shortly after Ms. O'Neill arrived in Illinois, however, Mr. Teutsch berated her on a group conference call with her male colleagues for the number of employees committed to the assignment, even though it was the number of employees he had instructed her to include.

48.     After Mr. Teutsch criticized the number of Dataminr employees on the project, Ms. O'Neill changed her flight to fly back to New York ahead of her team. As a result, she left directly to the airport from her hotel the next morning, before the rest of her team was awake. Because she was unable to return her visitor badge to the client's facility herself, Ms. O'Neill left the visitor's badge in an envelope with the hotel front desk, and asked one of her colleagues to retrieve it and return it to the client.

49.     Despite Dataminr's discriminatory treatment of her, Ms. O'Neill worked hard on each area identified and made progress towards meeting the heightened performance expectations. In her last status call with Ms. Johnson, Ms. Secor, and Mr. Teutsch, on August 6, 2014, they stated that Ms. O'Neill's progress was good and that they did not have any comments for her.

50.     On August 25, 2014, Dataminr fired Ms. O'Neill over the telephone. During the call, Mr. Teutsch told her that – contrary to the last status update and her actual performance – she had not met the business goals of the PIP and had not improved her interactions with her colleagues. Neither Mr. Teutsch, nor Ms. Secor or Ms. Johnson, who were also on the call, provided her with any specific examples of deficiencies.

51.     In Dataminr's April 17, 2015 position statement to the EEOC, however, the Company raised a new pretextual explanation for the termination of Ms. O'Neill's employment, citing her failure to return the visitor badge and casting it as a "security breach" precipitating the termination.

52.     When Dataminr terminated Ms. O'Neill in August 2014, she was the only woman on a team with six male employees and a male supervisor, and the only female director other than Ms. Johnson and Ms. Secor, both of whom were in back-office positions.

53.     The stress from the discrimination and swift and unlawful retaliation that ended her career at Dataminr has taken a physical and emotional toll on Ms. O'Neill. The stress has exacerbated her depression and has caused stress-induced circulatory problems, loss of sleep, and stomach pain, among other ailments.

54.     Ms. O'Neill is entitled to damages as a result of Dataminr's unlawful discrimination and retaliation.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Discrimination Because of Sex)**
**(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000c, Et. Seq.)**

55.     Ms. O'Neill incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

56.    Title VII prohibits an employer from discriminating against an employee in the terms and conditions of her employment on the basis of sex.

57.    Dataminr violated Title VII when it intentionally discriminated against Ms. O'Neill in the terms and conditions of her employment because of her sex.

58.    As a direct result of Dataminr's discriminatory acts, Ms. O'Neill is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**SECOND CLAIM FOR RELIEF**
**(Retaliation)**
**(<u>Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000c, Et. Seq.</u>)**

59.    Ms. O'Neill incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

60.    Title VII prohibits an employer from retaliating against an employee in the terms and conditions of her employment for exercising her rights under the statute.

61.    Dataminr illegally retaliated against Ms. O'Neill for exercising her rights under the statute.

62.    As a direct result of Dataminr's retaliatory acts, Ms. O'Neill is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**THIRD CLAIM FOR RELIEF**
**(Discrimination Because of Gender)**
**(New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*)**

63.     Ms. O'Neill incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

64.     The NYC HRL prohibits an employer from discriminating against an employee in the terms and conditions of her employment on the basis of gender.

65.     Dataminr violated the NYC HRL when it intentionally discriminated against Ms. O'Neill in the terms and conditions of her employment because of her gender.

66.     As a direct result of Dataminr's discriminatory acts, Ms. O'Neill is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**FOURTH CLAIM FOR RELIEF**
**(Discrimination Because of Disability)**
**(New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*)**

67.     Ms. O'Neill incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

68.     The NYC HRL prohibits an employer from discriminating against an employee in the terms and conditions of her employment on the basis of disability or perceived disability.

69.     Dataminr violated the NYC HRL when it intentionally discriminated against Ms. O'Neill in the terms and conditions of her employment because of her disability or perceived disability.

70.     As a direct result of Dataminr's discriminatory acts, Ms. O'Neill is entitled to damages including, but not limited to past and future lost wages and benefits, damages to

compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**FIFTH CLAIM FOR RELIEF**
**(Retaliation)**
**(New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 _et seq._)**

71.     Ms. O'Neill incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

72.     The NYC HRL prohibits an employer from retaliating against any employee who has engaged in any activity protected by the NYC HRL.

73.     Dataminr violated the NYC HRL when it retaliated against Ms. O'Neill for engaging in conduct protected by the NYC HRL.

74.     Ms. O'Neill is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**SIXTH CLAIM FOR RELIEF**
**(Discrimination Because of Disability)**
**(The Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12111–12117)**

75.     Ms. O'Neill incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

76.     The ADA prohibits an employer from discriminating against an employee in the terms and conditions of her employment based on a disability or perceived disability.

77.     Dataminr violated the ADA when it discriminated against Ms. O'Neill because of her disability or perceived disability.

78.     As a direct result of Dataminr's discriminatory acts, Ms. O'Neill is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**SEVENTH CLAIM FOR RELIEF**
**(Retaliation)**
**(<u>The Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12111–12117</u>)**

79.     Ms. O'Neill incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

80.     The statute prohibits employers from discriminating against employees who ask for reasonable accommodations under the statute, or who exercise other rights the statute protects.

81.     Dataminr retaliated against Ms. O'Neill based on her request for reasonable accommodation and engagement in other conduct protected by the statute in violation of the law.

82.     Dataminr retaliated against Ms. O'Neill based on her request for reasonable accommodation and engagement in other conduct protected by the statute in violation of the law.

83.     Ms. O'Neill is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.     Declaring that the acts, practices, and omissions complained of herein are
        unlawful and violate Title VII, the ADA, and the NYC HRL;

16

B.      Directing Defendant to pay Ms. O'Neill her back pay, compensatory damages, and pre-judgment interest for violations;

C.      Directing Defendant to make Ms. O'Neill with respect to lost benefits and equity;

D.      Directing Defendant to reinstate Ms. O'Neill's employment or pay Ms. O'Neill front pay in lieu of reinstatement,

E.      Directing Defendant to pay exemplary and punitive damages commensurate with Dataminr's ability to pay and sufficient to punish and deter continuation of Dataminr's discriminatory and unlawful employment practices;

F.      Awarding Ms. O'Neill reasonable attorneys' fees, costs, and expenses; and

G.      Awarding such other legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. O'Neill demands a trial by jury on all questions of fact raised by the complaint

Dated: New York, New York
            December 3, 2015

                                                    Respectfully submitted,

                                                    /s/ Cara E. Greene
                                                    Cara E. Greene

                                                    **OUTTEN & GOLDEN LLP**
                                                    Cara E. Greene
                                                    Gregory S. Chiarello
                                                    3 Park Avenue, 29th Floor
                                                    New York, New York 10016
                                                    Telephone: (212) 245-1000
                                                    Facsimile: (646) 509-2071

                                                    *Attorney for Plaintiff*